### MORSE et al. v. TEXAS CO.
#### Civ. A. Nos. 2802 and 2840.

United States District Court
W. D. Louisiana, Opelousas Division.
Jan. 9, 1954.

See also 10 F.R.D. 23.

Warren Hunt, John C. Morris, Jr., Rayville, La., for plaintiffs.

Malcolm E. Lafargue, Shreveport, La., D. Douglas Howard, New Orleans, La., for defendant.

DAWKINS, District Judge.

These suits were filed in the State Courts of St. Martin and Iberville Parishes in September 1949, and were removed to the Federal Courts for the Western and Eastern Districts of Louisiana, respectively, in which those parishes are situated. Later No. 2840 was transferred to the Western District of Louisiana and consolidated with No. 2802.

The preliminary motions and pleadings having been disposed of, they were tried on the merits January 14 and 15, 1953. The issues are, in the main, the same. Defendant moved for judgment

in its favor on the record, after the completion of plaintiffs' case and the motion was referred to the merits. After the defendant completed its defense and the cases were otherwise closed, they were submitted upon briefs to be filed, by plaintiffs in sixty days after the Court Reporter filed a transcript of the evidence, and by the defendant within forty-five days following receipt of copy of plaintiffs' brief. The note of evidence was filed May 14, 1953, and on July 13th, plaintiffs' brief was given to the Clerk. At their request the records in both cases were mailed to this Judge on September 25, 1953. Defendant has not as yet filed a brief, in spite of the fact that the Clerk, in transmitting the record to the Judge, at plaintiffs' request, notified its counsel thereof, and the Court late in December wrote this counsel direct asking if a brief would be submitted. On January 6, 1954, a reply was received stating it would be filed as soon as finished.

The suits seek the annulment of certain tax deeds and foreclosure proceedings which took place in the years 1931 and 1936, respectively, on the grounds of fraud, and the violation of an alleged relationship of trust to plaintiffs and their ancestors in title by the defendant. Defendant denies all of said charges, or that any trust relationship existed, and pleads several periods of prescription under codal and statutory provisions of the state.

## Opinion

The following facts are undisputed:

Prior to April 24, 1926, Clifford and John F. Morse had acquired title to the following described property, to-wit:

Lots or radiating sections 5 and 6 in T 8 S, R 7 E, less that part thereof owned by the M. L. & T. R. R.

Lots or radiating sections 3, 4, 5, 6, 8, 9, 10, 11, 13 and 14; radiating section 27; Lot 2 of section 62; Lots 1, 3, 5, 6, 7 and 8 in section 63; all of fractional section 64; all of section 65; Lot 1 of section 70; E½ of SW¼ and SE¼ of section 74; Lot 3 or E½ of SW¼, Lot 4 or SE¼, Lot 2 or W½ of SW¼, and Lot 1 or fractional N½ of section 75 except lands owned by M. L. T. & R. R.; Lot 2 or frac. SW¼ of section 76; E½ of Lot 2, E½ of Lot 3 and W½ of W½ of Section 79; E½ of NE¼, W½ of NW¼ and S½ of section 80; all of section 81; Lot 3 of section 82; Lots 1, 2, 3, 4, 5, 6 & 7 of section 83; all of section 84 except the SW¼ of the NW¼; Lots 3 and 4 of Section 85, all in Township 8 South, Range 8 East.

Since both plaintiffs and defendant rest their claims on the same chain of title up to the tax and foreclosure sales, no other statement of title will be made. On that date the two Morses executed a mortgage upon the property, securing three promissory notes payable to the makers' own order and endorsed in blank (permitted by the Louisiana law), two for the sum of $6,000 each and the last for $7,000, maturing one, two and three years from date, bearing eight percent (8%) per annum interest, and containing a stipulation for the payment of ten percent (10%) attorneys fees if placed in the hands of an attorney for collection after maturity. The mortgage carried further provisions that the holders of the notes, which became the Haynesville Mercantile Company of Haynesville, La., (called Haynesville) should receive the revenue arriving from the property from any source whatever, such as sale of timber, mineral leases and bonuses, rentals, gravel or other minerals, or parts of the land sold.

Thereafter, on May 24, 1926, the Morses conveyed to Hugh W. Whatley a one-third interest in the entire property for the sum of $6,000, represented by two notes for $3,000 each, due in one and two years from date, and secured by mortgage upon the said one-third undivided interest purchased by him, bearing similar interest and attorneys fees, and also negotiable as in the case of those made by the Morses.

The three Morse notes were all in default, as were those by Whatley and the mortgages were in the process of foreclosure by Haynesville in August 1929,

when the defendant, The Texas Company, became interested in the lands, or some parts thereof for their possible mineral value. On examining the title these mortgages appeared and the holders, Haynesville and W. P. Baucum, respectively, were unwilling to subordinate them to any lease from the owners to defendant, and an agreement was finally reached by the mortgagees, the mortgage debtors and the defendant, The Texas Company, by which the latter paid the mercantile company the net sum of $26,189.72, to cover principal, interest, cost, taxes and attorneys fees due by the Morses, less all sums received from the property, and to Baucum $4,538.40 to cover balance due him, less some $1,500 credit due to Whatley. Haynesville, at the same time, September 5, 1929, executed an assignment and transfer of the mortgage notes to defendant with full subrogation to rights thereunder and contemporaneously the Morses and Whatley on the one part, and The Texas Company on the other, entered into an agreement, the substance of which was as follows:

It recited that Whatley and the Morses had executed a mineral lease on the entire property involved herein and that while said lease stipulated a cash payment of "Ten and no/100 ($10.00) dollars and other valuable considerations * * * in truth and in fact" the real consideration was "that The Texas Company has caused the dismissal of that certain suit in foreclosure" of Haynesville Mercantile Company against John F. Morse, et al., "and further the fact that The Texas Company has acquired the notes secured by said mortgage and all rights pertaining thereto" and had also acquired the notes of Whatley held by Baucum secured by mortgage, "thereby giving and granting unto owners of said land * * * relief from said mortgage foreclosure and an extension of time within which to pay said obligations" which all the parties "consider a good, sufficient and adequate consideration" for said leases; that The Texas Company "in furtherance of the agreement" with Whatley and the Morses "does hereby grant an extension on all of said notes * * * of two and one-half (2½) years from September 5, 1929" within which time said first parties (Whatley and the Morses) "have the opportunity of paying off said mortgage obligations, but at the expiration of said two and one-half (2½) years said The Texas Company may proceed to the enforcement of collection of said notes by suit in foreclosure or otherwise, as it may elect". Further, that all sums arising from said lands by the sale of timber, from mineral leases, rentals or otherwise, should be paid direct to The Texas Company "and thereby be applied * * * and credited as partial payment in extinguishment of said mortgage, *to be imputed first to the payment * * * of the interest and then to the principal of said notes*" and other obligations; and The Texas Company was further authorized to "retain all bonus money, rentals, royalties, etc." coming to Whatley and the Morses and the latter agreed to pay over to defendant any and all sums which they collected from said sources, to be credited upon said indebtedness. (Emphasis by the writer.)

In addition to these stipulations for the payment of the three mortgage notes and other obligations by the Morses under the mortgage of April 24, 1926, Whatley agreed that thereafter any sums coming to him should be applied first to the balance due on three notes given by the Morses and then to the two notes which he gave for his one-third interest in the property. The agreement further took notice of certain outstanding mineral leases and provided that all sums becoming due or collected thereunder should likewise be paid to The Texas Company for credit upon said obligations, and that it would have the option of taking mineral leases upon such of the property as might be released by other lessees, under conditions stipulated; and finally that all amounts

arising from the sale of shell, timber, etc., should likewise be applied to the indebtedness.

There was a further provision that The Texas Company should have the right to make a geophysical exploration of the entire property, and to select, within a certain minimum, such portions as it saw fit for actual leasing, at an initial price of $3 per acre. This was done according to agreement and in excess of $5,000 was credited upon the indebtedness.

The taxes for 1930 were not paid on the property in either parish and on the 8th day of August, 1931, the Sheriff and Tax Collector for St. Martin Parish sold that portion located therein to The Texas Company for the sum of $815.61, including several types of taxes and costs. This deed opens with the statement that:

"*J. F. Morse, Clifford Morse and H. W. Whatley,* having been assessed with the property hereafter described for the year 1930 and the taxes thereon having become delinquent on the 31st day of December of said year. I made out and mailed to said *J. F. Morse, Clifford Morse and H. W. Whatley* by registered letter, a notice in conformity with said Act No. 170 of 1898 [LSA–R.S. 47:1901 et seq.], and the said *J. F. Morse, Clifford Morse and H. W. Whatley,* failing to pay the amount of taxes, interests, costs, etc., due by him as shown by the assessments rolls of 1930, I caused to be seized and advertised for sale in *The Weekly Messenger* in the manner prescribed by said Act No. 170 of 1898, a weekly newspaper published in the town of St. Martinville being the Official Journal of the Parish of St. Martin. Said advertisement appearing in the issues, from the *4th* day *July, 1931* to the *8th* day *August, 1931* of the following described property, viz:"

At the bottom thereof there appears the following:

"Receipt for Registered Article No. 640 15. fee paid. 1st class postage paid. 4/27, 1931. From Sheriff's Office St. Martinville, La. Addressed to Clifford Morse & Whatley, Rayville, La. Saint Martinville, La. Registered Apr. 27, 1931."

A similar sale for non-payment of taxes was made by the Sheriff and Tax Collector of Iberville Parish for that portion of the property situated therein on June 20, 1931, the deed reciting compliance with law with respect to notice and advertising and stating the property "being assessed in the name of Morse, John F. and Clifford, and H. W. Whatley * * for the year 1930" on which there were due taxes "amounting to Sixty-five and 60/100 ($65.60) dollars" for which sum the property was sold to C. K. Schwing, et al. This deed was filed and recorded in the conveyance records of Iberville Parish June 23, 1931.

On March 12, 1932, the purchasers at the tax sale in Iberville Parish executed to The Texas Company a quitclaim deed therefor reciting the payment of the sum of Seventy-eight and 72/100 ($78.72) dollars. This deed was filed and recorded in the conveyance records of said parish on April 7, 1932.

On the 16th day of May, 1936, the Sheriff of St. Martin Parish "acting by virtue of a writ of seizure and sale" issued by the State district court for said parish and reciting compliance with the law by advertising, etc., sold the property situated in both Iberville and St. Martin Parishes to the defendant, The Texas Company, for the sum of Five Thousand and no/100 ($5,000) Dollars, "being the highest and best bid * * ". This deed was recorded in the conveyance records of St. Martin Parish on May 16, 1936.

Both of the Morses are now dead. John F. passed on before the suits were filed and his heirs were made parties originally. Clifford also died some time after their institution, but his deposition had been previously taken and in it

he admitted he knew the properties had been sold for taxes in the early thirties.

In the original dealings between the Morses and Whatley, with The Texas Company, Whatley acted for and signed the memorandum agreement dated September 5, 1929, as their agent and attorney in fact. Whatley died in October 1934, but his son, Hugh, Jr., on cross-examination also admitted that he knew the properties had been foreclosed upon under the mortgage by defendant as early as 1937 for, together with one Daws Harris, he went to St. Martinville and with the help of those in the Recorder's office saw and examined the records.

Thus, so far as the conveyance records of Iberville and St. Martin Parishes were concerned, the title passed out of the plaintiffs or their ancestors in title at tax sales in 1931 and 1932 which were duly recorded. This was legal notice to all concerned, subject to the periods of redemption allowed by law. Had the property been purchased by an outsider, ownership by the parties to this controversy, as well as all incumbrances thereon, would have been wiped out. However, since the property in St. Martin was purchased by the mortgagee, The Texas Company, and that in Iberville by others, who, within the year of redemption conveyed it to defendant, ordinarily the mortgage on the property in St. Martin would have been extinguished by confusion, since one ordinarily cannot be a mortgagee on his own property. As stated earlier, the mortgage notes were negotiable by delivery and required no formal assignment.

The defendant chose to ignore this legal consequence, and some four or five years later, in 1936, instituted foreclosure on the same property and at the Sheriff's sale bought it for the price of $5,000 which, when credited upon the entire indebtedness, still left unpaid, with interest, etc., some $25,000, after allowing credit for sums arising from the lease (approximately $5,000) and revenues from the property while the title was in plaintiffs. It is apparent however that, whether defendant's title rests upon the tax purchase or the foreclosure, it had long since been perfected when these suits were filed, under the prescriptive provisions of the Louisiana law, unless that result and the proceedings under which the property was sold were voidable for fraud or the abuse of a trust obligation as the plaintiffs contend.

It becomes necessary therefore to analyze the evidence introduced to support the charges of fraud.

■■ We begin with the legal axioms that fraud is never presumed, and parole evidence cannot be used to prove title to real estate. The latter rule, no doubt, is the reason plaintiffs' counsel brought these suits as actions in nullity, asserting the tax sales and foreclosures were fraudulent. In an action at law to try title, which is known in Louisiana as a petitory action, all transactions recorded in conveyance records are notice to everyone from the date of recordation and none other is required. However, these suits, in their nature, involve principles of equity requiring the Judge to determine whether the plaintiffs have discharged the very heavy burden resting upon them, after the lapse of almost twenty years, with at least some of them, especially those assuming to look after the matter, long since had actual knowledge of the transfers.

First as to the relationship of trust, it is sought to impose this responsibility upon the defendant from the circumstances surrounding the entire matter from the time The Texas Company undertook to acquire a lease of the minerals. In order to do this, it became necessary to stop the foreclosure by the holders of the mortgage notes then in progress. The holders refused to subordinate them to the desired lease, and defendant had to put up something in excess of $30,000, or sufficient to satisfy the principal, interest, cost, attorneys fees and taxes on both the first mortgage and the secondary one securing the H. W. Whatley notes which he gave as the purchase price of the one-third interest in the property from the Morses, less credits arising from lease bonus, sales of timber,

lease rentals, etc., which had accrued from the date of the mortgages to September 5, 1929, when defendant came into the picture.

As stated earlier, an agreement was entered into between defendant, the Morses and Whatley granting a definite extension period of two and one-half (2½) years in which to discharge the entire indebtedness, with provisions for the application of any funds arising from whatever source as they accrued *"first to the liquidation of the interest,* and then to the principal of said notes, until all of said notes, in full of principal and interest, attorneys fees and costs shall have been fully paid and liquidated * * * *".* Although nothing was said about the payment of taxes in this instrument, which presumably represented the entire agreement between the parties, it is sought to impose that obligation upon defendant under the theory that Haynesville Mercantile Company had paid them, and that defendant, impliedly or according to the understanding of the mortgagors, undertook to continue the practice. The taxes paid by Haynesville, former holder, were, along with all other sums expended or due under the terms of the mortgage, included in the total amounts paid by The Texas Company when the notes were assigned to it. While it is not altogether clear as to what happened with respect to the 1929 taxes, accruing but not collectible, when the agreement was entered into on September 5th of that year, it is beyond question that defendant did not pay those for the following year of 1930 and all the property was sold therefor during 1931 as stated earlier in the résumé of undisputed evidence. As heretofore pointed out, in addition to the presumption that the Tax Collector had performed his duty to give notice to the tax debtors, the tax deed to the larger tract in St. Martin Parish specifically recites that *"J. F. Morse, Clifford Morse* and *H. W. Whatley* (all of whom were still living at that time) having been assessed with the property * * * for the year 1930, and the taxes thereon having been delinquent on the 31st day of December of said year. I made out and mailed to said *J. F. Morse, Clifford Morse* and *H. W. Whatley by registered letter,* a notice in conformity" with the State law "said *J. F. Morse, Clifford Morse* and *H. W. Whatley* failing to pay the amount of taxes, interest, costs, etc., * * * I caused to be seized and advertised for sale in *The Weekly Messenger"* also according to statute "published in the Town of St. Martinville, being the Official Journal of the parish * * * in the issues from the 4th day of July, 1931, to the 8th day of August, 1931, the following described property, viz:" The description included the property in both parishes. In addition, somewhat out of the ordinary practice, there appears at the bottom of the said tax deed as recorded the notation earlier quoted which said "Receipt for Registered Article No. 640 15. fee paid. 1st class postage paid. 4/27. 1931. From Sheriff's Office St. Martinville, La. Addressed to Clifford Morse & Whatley, Rayville, La. Saint Martinville, La. Registered Apr. 27 1931."

All of this, coupled with the acknowledgment by Clifford Morse in his deposition that he knew the property had been sold for taxes in the early thirties, plus the legal notice arising from the recordation of the deeds, would seem to greatly outweigh the obviously equivocal and uncertain statements of some of the plaintiffs that they did not know the property had been sold for taxes until about the time of filing the suits. Besides, some of them, particularly those to whom had apparently been entrusted the responsibility of looking after the matter, including H. W. Whatley, Jr., knew the defendant had acquired the property at tax sale, and further, from his interviews with Blish, the attorney for defendant, in connection with Whatley, Jr.'s alleged offer of $12,000 to $15,000 in full payment shortly after the death of H. W. Whatley, Sr. This witness also admitted that in 1937 he knew the origi-

nal mortgage had been foreclosed, *by an actual examination of the conveyance records;* yet no demand for an accounting as to credits from revenues or other sources, was ever made. Plaintiffs all allowed this condition to stand thereafter for between eleven and twelve years, until some of them read in a newspaper of the bringing in of an oil well on what was termed "the Whatley lease" in 1948 and these suits were not filed until 1949.

It is true that plaintiffs contend they were continuously assured, mainly by Blish, that they need not worry, their interests would be protected. However, when the entire evidence is considered, it is more consistent with a disposition to be lenient. Plaintiffs had paid nothing, and the credits for the lease and from other sources, were not sufficient to cover interest, taxes and costs accruing upon the property before the title passed to defendant.

■ It is not believed that the agreement of September 5, 1929, can reasonably be construed as an undertaking of trust. While its provisions were rather full in providing for the application of funds arising from the property by lease sale or otherwise to the indebtedness, these were clearly stipulations to protect defendant for the substantial sum of money which it had advanced to get a mineral lease upon the property which it believed at the time had prospective value for oil and gas, the defendant's principal business.

■ Giving effect to every proven fact in the case, the conclusion seems inevitable that plaintiffs have not only failed to sustain the heavy burden of proof which they assumed in bringing the suits after such a long lapse of time, and only when the property appeared to have value for mineral purposes, but the weight of the evidence is the other way. All of the pleas of prescription or limitation urged by the defendant should be sustained and the plaintiffs' suit dismissed at their cost.